UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**James Sibley,**
**o/b/o Susan Sibley (deceased)**

    **v.**                        Civil No. 12-cv-20-PB
                                            Opinion No. 2013 DNH 022

**Michael J. Astrue, Commissioner,**
**Social Security Administration**


## MEMORANDUM AND ORDER


James Sibley, the widower of claimant Susan Sibley, seeks judicial review of a ruling by the Commissioner of the Social Security Administration denying Sibley's application for Social Security Disability Insurance ("SSDI").  Sibley claims that the Administrative Law Judge ("ALJ") lacked substantial evidence to support his finding that she was not disabled as of her date last insured.  Sibley also claims that the ALJ failed to properly evaluate the medical evidence, failed to call a medical advisor to testify as to Sibley's date of onset, relied on improper factors to conclude that Sibley's testimony was not credible, and ignored Sibley's request to reopen a prior termination of benefits.  For the reasons set forth below, I remand the case for further proceedings before the Commissioner.

## I.   BACKGROUND[1]

### A.   Procedural History

Sibley, who died unexpectedly on June 12, 2011, began receiving SSDI in 1987 at age twenty-one due to systemic lupus erythematosus, arthritis, and severe avascular necrosis-related degenerative joint disease.  After receiving benefits for nine years, the SSA terminated them in August 1996 based on its determination that her impairments had improved enough to allow her to return to work.  She did not appeal the termination, but in July 1997, she filed a new claim and moved to reopen and reverse the earlier termination decision.  On August 17, 1998, the SSA Office of Disability Adjudication and Review approved Sibley's new application and reinstated her benefits retroactive to the August 1996 termination date, finding that she had been continuously unable to work since then.

In January 2002, the SSA began a continuing disability review of Sibley's case.  On January 24, 2003, the SSA provided

---

[1] The background facts are presented in the parties' Joint Statement of Material Facts (Doc. No. 14) and are summarized here.  I also rely on the Plaintiff's supplement to the joint statement and the Administrative Transcript.  Citations to the Administrative Transcript are indicated by "Tr."

notice that Sibley's benefits would again be terminated.[2]  Sibley
did not appeal the decision.

On February 9, 2009, Sibley filed a new application for
SSDI.  She alleged a disability onset date of April 1, 2003.
She claimed disability due to lupus, fibromyalgia, vascular
necrosis, migraines, chronic pain, bone deterioration,
arthritis, and gastroesophageal reflux disease.  Her application
was denied initially and upon reconsideration.  She requested a
hearing before an ALJ, which was held on October 18, 2010.
Sibley, represented by counsel, her husband, and a vocational
expert testified.

At the hearing, Sibley moved to reopen the January 2003
termination, arguing that there was no evidence in the record to
support a finding of medical improvement.  Tr. 60-61.  She also
disputed the onset date as originally alleged in her February
2009 application.  Her counsel explained that the district

---

[2] The notice stated, "After reviewing all of the information
carefully, we've decided that your health has improved since we
last reviewed your case.  And you're now able to work. . . .
You're no longer disabled as of 12/02."  Doc. No. 11-3.  The
notice included a second, contradictory explanation for the
termination.  It stated, "[t]here is no medical evidence on file
to establish your current level of functioning" because "you
failed to cooperate with the review process."  Id.  Sibley
claims she cooperated with the agency by providing contact
information for her treatment providers.

office "picked" that date "because they won't allow you a date of onset that's within a previously adjudicated period." Id. at 43. See also id. at 145 (stating in the Field Office Disability Report that current onset date used was April 1, 2003, because prior claim cessation was March 2003). Notwithstanding the onset date alleged in her application, Sibley maintained that "she became disabled when she first went on Social Security and has continued to be disabled" since then. Id. at 44. The ALJ did not resolve the onset date issue and used the April 1, 2003, date during the hearing "for the sake of argument." On January 20, 2011, Sibley's counsel submitted a post-hearing memorandum amending her alleged onset date from April 1, 2003, to June 9, 1992. Tr. 208.

On February 3, 2011, the ALJ issued a decision finding that Sibley was not disabled at any time between April 1, 2003, and September 30, 2004, her date last insured. Tr. 24. He did not address her amendment of the onset date. Her claim was selected by the Decision Review Board, but was never reviewed. Accordingly, the ALJ's decision is the final decision of the Commissioner.

4

B.    **Medical History**

Sibley has a history of disabling health problems that began at age sixteen, including lupus and avascular necrosis which resulted in multiple joint replacements.  She received SSDI from 1987 through February or March 2003.[3]  Because the SSA previously determined that Sibley was disabled during that period, I focus on her treatment history beginning in 2003, when her benefits were terminated.

The record contains hospital records and treatment notes for the period from July 3, 2002, through August 10, 2007.  In addition, two physicians submitted medical assessments of Sibley's functional limitations: Dr. Douglas Joseph, who became Sibley's treating orthopedist in October 2004 and continued to treat her at least until his January 2011 report, Tr. 213-14; and Dr. Matt Mesewic, a non-examining, consulting physician.  Id. at 378-85.  Following the hearing before the ALJ, Dr. Joseph submitted a check-marked questionnaire.  See id. at 213-14.  He confirmed the following:

---

[3] The 2003 termination letter indicated that her last benefits check would be for February 2003, but the 2009 disability application indicated she received benefits through March 2003.

- He performed bilateral knee replacements on Sibley in May
  2006 and May 2007;

- His clinical findings and her medical history are
  consistent with her expressed level of symptomology,
  including that, at least since her hip surgery in 2001, she
  never had an extended period of time during which her pain,
  fatigue, and other symptoms would have allowed her to work
  outside of her home on more than a very flexible, part-time
  basis;

- Since 2004, there was never an extended period when her
  chronic pain, fatigue, and exertional limitations would
  have allowed her to work outside her home at even a
  sedentary job on a full-time reliable basis; and

- Sibley would need to miss work more than four days per
  month and would require more than four unscheduled rest
  periods of at least ten minutes during an eight-hour
  workday.

Dr. Masewic completed a physical residual functional
capacity assessment ("RFC") on March 26, 2009.  Tr. 378-85.  He
indicated that her primary diagnosis was fibromyalgia, and her
secondary diagnosis was avascular necrosis.  Id. at 378.  He
concluded that there was "no evidence to support 'bone
deterioration' or arthritis"; her lupus had been in remission
since 1997; and there was no evidence of recurrence between
April 1, 2003, and September 30, 2004.  Id. at 385.  In
addition, her migraines were under control and her reflux
symptoms did not cause severe impairment or have a significant
effect on functional capacity.  Id.  Her bilateral avascular

necrosis had "been stable," did not cause the claimant

significant pain, and contributed only minimally to loss of

functional capacity.  Id.

    Dr. Masewic also concluded that Sibley suffered from pain

and fatigue due to fibromyalgia, which contributed

"significantly to loss of functional capacity."  Id.  He noted

that she used "a small amount of vicodin to treat pain," and

that fibromyalgia must be the source of her "'chronic pain' as

there is no other apparent cause."  Id.  He also concluded that

she could occasionally lift or carry twenty pounds; frequently

life or carry ten pounds; sit, stand, or walk for about six

hours in an eight-hour workday; push or pull an unlimited

amount; and occasionally climb, balance, stoop, kneel, crouch,

and crawl.  Id. at 379-80.  He indicated that she had no

manipulative, visual, communicative, or environmental

limitations.  Id. at 381.

    Dr. Masewic stated that Sibley's "allegations [regarding

the severity of her symptoms] are not credible" because they

"exceed what would be expected when reviewing the totality of

the medical and non[-]medical evidence."  Id. at 385.  He

pointed to a family camping trip in August 13, 2004, when she

"walked down a steep hill to the docks daily" as evidence that
her allegations were inconsistent with the medical evidence.
Id.

**C.   Administrative Hearing - May 16, 2011**

    1.  Sibley's Testimony

    Sibley testified that she suffered from chronic pain and
fatigue, which were so severe that she was unable to work on
even a part-time basis.  She testified that she experienced
"excruciating pain" when she walked or sat for prolonged
periods, and that she also suffered swelling in her legs.  She
typically slept throughout the day so that she could be awake
when her children came home from school.  Tr. 47.  She testified
that she could not shower without assistance.  Id.  She also
stated that she was "trying to make artwork using recycled
materials."  Id.

    Sibley testified that she had a series of joint surgeries
over the years, id. at 39-44, 51-57, including hip and knee
surgeries in 2001 and 2002.  Id. at 44.  She also testified that
in 2002 she experienced migraines that incapacitated her for
three days at a time.  Id. at 45.  She suffered repeated
fractures in her ankle due to her avascular necrosis.  Id.  In

addition, she testified that "if I use my hand with a [computer] mouse today I can't move it tomorrow.  That's been true since 1985."  Id. at 46.

The ALJ asked Sibley about the medical problems she was experiencing as of the date of the hearing.  She listed her current doctors and described a typical day.  Id. at 47.  She appeared at the hearing in a wheelchair and explained that she was unable to drive because of her ankle pain.  Id. at 48.  She testified that she was unable to make dinner, and her sleep patterns were irregular.

The ALJ asked her which of her conditions were present between April 1, 2003, and September 30, 2004.  Id.  Sibley testified that she had suffered from migraines since high school; degeneration of her bones beginning six months after her lupus diagnosis in 1985; macular degeneration "always"; swelling and arthritis "always"; fibromyalgia "since I was a kid"; and lupus since eighth grade.  Id. at 49.  She testified that "there's never been a pain-free time" in her life since 1985. Id.  She testified that she had suffered from depression for a long time, and that in 2003 and 2004 she was "so sick of having to go find out what's wrong with me from doctors," that she saw

9

doctors less frequently than before or after that time period.
Id. at 64.  She said, "I sat on the couch for a year."  Id.  She
did not provide any more specific testimony about her
impairments between April 1, 2003, and September 30, 2004.

### 2. Sibley's Husband's Testimony

Sibley's husband stated that Sibley suffered from medical
problems since he met her in 1990.  In 2000 and 2001, she had
difficulty walking, standing, and sitting.  She experienced
continuous leg, hip, and knee pain.  She was unable to walk long
distances, though they were able to go on a camping trip once.
He noticed that her health was deteriorating at the time of the
hearing, and that she suffered from worsening pain.  Id.

### 3. Vocational Expert Testimony

Vocational Expert Christine Spaulding testified that a
hypothetical individual with the same age, vocational
characteristics, and RFC as Sibley would be capable of
performing the jobs of cashier, fast food worker, sales
attendant, sales clerk, and telemarketer, which exist in
significant numbers in the regional and national economies.

10

**D.     The ALJ's Decision**

In his decision dated February 3, 2011, the ALJ followed
the five-step sequential evaluation process set forth in 20
C.F.R. 1520(a)(4) to determine whether an individual is
disabled.  Tr. 24-25.  Preliminarily, the ALJ found that
Sibley's date last insured was September 30, 2004.  Id. at 25.
At step one, he concluded that she had not engaged in any
substantial gainful activity during the period between her
alleged date of onset, which he deemed April 1, 2003, and her
date last insured.  Id.  At step two, he stated that Sibley had
the following severe impairments: avascular necrosis and
systemic lupus erythematosus.  Id.  He also noted that she had a
history of fibromyalgia, but that "the record contains no
notation of the requisite 11 of 18 tender points used to make
the diagnosis.  She also did not have joint effusion or
synovitis."  Id. at 26.  In addition, progress notes from 2003
and 2004 "documented no clinical evidence of the Lupus," and
"laboratory results in 2003 and 2004 were negative."  Id.

At step three, the ALJ concluded that the claimant did not
have an impairment or combination of impairments through her
date last insured that met or medically equaled one of the

11

listed impairments in 20 C.F.R. Part. 404, Subpart P, Appendix
1.  Id.   At step four, the ALJ found that Sibley retained the
RFC through her date last insured to perform light work.   He
followed a two-step analysis in reaching this conclusion.   Id.
at 27.  First, he considered whether she suffered from a
medically determinable impairment.   He concluded that she did,
and that those impairments "could reasonably be expected to
cause the alleged symptoms."   Id.   Second, he determined the
extent to which the intensity and persistence of the claimant's
symptoms limited her functioning.   Id.   He noted that "whenever
statements about the intensity, persistence, or functionally
limiting effects of pain or other symptoms are not substantiated
by objective medical evidence, I must make a finding on the
credibility of the statements based on a consideration of the
entire case record."   Id.   The ALJ found Sibley's testimony
regarding "the intensity, persistence and limiting effects of
these symptoms . . . not credible to the extent [it was]
inconsistent with" his assessment of her RFC.   Id.

     The ALJ provided several reasons for concluding that Sibley
was not credible.  First, the record showed "occasional office
visits but no documentation of exacerbations requiring emergency

12

room visits or hospitalization." Id. He stated that, "[w]hile her hip discomfort is no doubt, at times, bothersome, the record shows her symptoms have remained nominal in severity over time." Id. In addition, Sibley "does not rely on regular treatment modalities." Id. She "reports no significant problems with daily activities" and "was able to do simple chores, run errands, care for her two children, and partake in recreational activities." Id. Thus, he concluded, "the claimant's credibility as to the severity of her symptoms is, at best, suspect." Id.

The ALJ discounted Dr. Joseph's medical opinion in favor of Dr. Masewic's. Id. at 28. He explained that, although Dr. Joseph was a treating physician, his opinion was not entitled to controlling weight because he "did not begin treating the claimant until October 2004, which was after the claimant's date last insured." Id. In addition, when he examined her in October 2004, Dr. Joseph observed "that she walked quite well with just a slight limp." Id. After giving her an injection of pain relievers at that visit, "the claimant reported her hip was fine." Id. Finally, "X-rays of the hips were unremarkable." Id. Considering the "discrepancies between Dr. Joseph's

clinical observations and his January 2011 statement," the ALJ instead relied on the opinion of Dr. Masewic, "who asserted in March 2009, that the claimant could perform light exertion with occasional postural functions."  Id. at 28.

At step five, the ALJ concluded that there were jobs existing in the national economy in significant numbers that the claimant could perform.  Id.

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.

14

Id.  The ALJ's findings of fact are accorded deference as long as they are supported by substantial evidence.  Id.  Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

### III.  ANALYSIS

Sibley moves for reversal and remand on several grounds. She argues that the ALJ improperly weighed the expert medical evidence in the record; was required to call a medical expert to testify about the plaintiff's onset date; and improperly

discredited her testimony.[4]  I address each in turn, find that
each has merit, and grant the motion.

A.    **The ALJ Failed to Properly Weigh Expert Medical Evidence**

Sibley argues that the ALJ should have given controlling
weight to her treating physician's opinion.

When determining a claimant's eligibility for disability
benefits, an ALJ must consider all medical opinions in the case
record.  20 C.F.R. § 404.1527(b).  Generally, the ALJ must give
a treating source's opinion controlling weight if it is "well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with . . . other
substantial evidence [in the record.]"  20 C.F.R. §
404.1527(c)(2); Polanco-Quinones v. Astrue, 477 Fed. Appx. 745,
746 (1st Cir. 2012).  If the ALJ does not give the treating
source's opinion controlling weight, he must provide "good
reasons" for the weight he gives it.[5]  20 C.F.R. § 404.1527(c);

---

[4] Sibley also argues that the ALJ was required to address
her motion to reopen the 2003 benefits termination, and his
failure to do so requires remand.  Because I conclude that
remand is appropriate on other grounds, and the claimant has not
identified a jurisdictional basis for me to remand on this
basis, I decline to decide this issue.

[5] The factors the ALJ must apply when weighing medical
opinion evidence are: the length of the treatment relationship

Polanco-Quinones, 477 Fed. Appx. at 746. He must also explain
the weight given to any other medical opinion in the record. 20
C.F.R. § 404.1527(c). The ALJ's order "must be sufficiently
specific to make clear to any subsequent reviewers the weight
the adjudicator gave to the treating source's medical opinion
and reasons for that weight." Young v. Astrue, Civil No. 10-CV-
417-JL, 2011 WL 4340896, at *9 (D.N.H. Sept. 15, 2011) (quoting
SSR 96-2P, 1996 WL 374188 (July 2, 1996)). Because the ALJ
failed to discuss any of the factors set out in the regulations
and lacked substantial evidence for relying on the factors he
did consider, I remand the case for further proceedings.

    1.   <u>The ALJ Failed to Apply the Relevant Factors</u>

    The ALJ neglected to discuss any of the factors set out in
the regulations in weighing Dr. Joseph's and Dr. Masewic's
opinions. With respect to Dr. Joseph's opinion, the ALJ cited
its retrospective nature and "discrepancies" between it and Dr.
Joseph's treatment notes as the sole reasons for discounting the

---

and frequency of examination; the nature and extent of the
relationship; the extent to which medical signs and laboratory
findings, and the physician's explanation of them, support the
opinion; the consistency of the opinion with the record as a
whole; whether the treating physician is a specialist in the
field; and any other factors that tend to support or contradict
the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

opinion.  Tr. at 28.  He did not discuss any of the factors
listed in the regulations.  See 20 C.F.R. § 404.1527(c)(2)-(6).
As for Dr. Masewic, the ALJ stated only that "[i]n light of the
discrepancies" he perceived between Dr. Joseph's treatment notes
and his January 2011 evaluation, "I rely instead on the opinion
of State Agency physician Matt Masewic, M.D., who asserted in
March 2009, that the claimant could perform light exertion with
occasional postural functions."  Tr. at 28.  The ALJ also failed
to evaluate Dr. Masewic's opinion in terms of the factors set
out in the regulations.  See id.

    Accordingly, remand is appropriate so that the ALJ can
reassess the medical opinions of Drs. Joseph and Masewic in
accordance with the regulations.  On remand, the ALJ is free to
decide that Dr. Joseph's opinion does not merit controlling
weight, but he must provide "good reasons" for the weight he
gives to Dr. Joseph's opinion and the weight he gives to Dr.
Masewic.  See 20 C.F.R. § 404.1527c; Polanco-Quinones, 477 Fed.
Appx. at 746.

    2.  The ALJ Lacked Substantial Evidence for Discounting
        Dr. Joseph's Opinion

    The ALJ provided two reasons for discounting Dr. Joseph's
opinion: first, because the opinion was retrospective in that it

18

was written in January 2011 and related to a period beginning in October 2004, after Sibley's date last insured; and second, because Dr. Joseph's treatment notes were not consistent with his January 2011 opinion.  I conclude that these factors do not constitute substantial evidence justifying the ALJ's decision to discount Dr. Joseph's opinion.

### a.   Retrospective Opinion

The ALJ noted that Dr. Joseph's opinion did not deserve controlling weight because he "did not begin treating the claimant until October 2004, which was after the claimant's date last insured."  This fact, on its own, is not dispositive. Before discounting a retrospective medical opinion, an ALJ must consider whether it substantiates a disability that existed during the eligible period or is corroborated by contemporaneous evidence.  See Marcotte v. Callahan, 992 F. Supp. 485, 491 (D.N.H. 1997) (citing Evangelista v. Sec'y of H.H.S., 826 F.2d. 136, 140 (1st Cir. 1987)).  The ALJ failed to properly evaluate Dr. Joseph's retrospective diagnosis.

### b.   Discrepancies

The ALJ's factual findings of discrepancies between Dr. Joseph's 2011 report and his treatment notes are not supported

by substantial evidence.  The record includes only five pages of treatment notes by Dr. Joseph.  See Tr. 285-86, 289-91.  Those notes are from two office visits that occurred on October 14, 2004, and January 19, 2006.  In identifying supposed discrepancies between Dr. Joseph's 2011 opinion and his treatment notes, the ALJ referred only to the notes from Sibley's October 2004 office visit.  Dr. Joseph treated her from October 14, 2004, at least through January 2011, when he completed the evaluation for this case.

It is entirely appropriate to discount a treating physician's opinion when it is inconsistent with his own treatment notes.  See, e.g., Teague v. Astrue, 638 F.3d 611, 616 (8th Cir. 2011); Smith v. Astrue, 717 F. Supp. 2d 164, 172 (D. Mass. 2010).  Here, however, the barebones record – five pages of treatment notes from two visits two years apart - of Dr. Joseph's treatment relationship with Sibley cannot reasonably be used to either bolster or negate the credibility of his conclusions in 2011 about her functionality between 2001 and 2011.  Cf. Soto-Cedeno v. Astrue, 380 Fed. Appx. 1, at *3 (1st Cir. 2010) (stating that a lack of treatment notes "does not justify the rejection" of a treating physician's opinion).

20

Assuming, though, for the sake of analysis that such minimal notes could undermine or bolster Dr. Joseph's conclusions, the ALJ lacked substantial evidence to support his findings of discrepancies.

First, the ALJ noted that when Dr. Joseph examined Sibley in October 2004, he observed "that she walked quite well with just a slight limp."  He failed to note Dr. Joseph's subsequent observation that Sibley had "very sharp localized tenderness in the lateral aspect of the hip centered over the trochanter" and "discomfort" in her hip socket.  Second, the ALJ noted Dr. Joseph's observation that the "X-rays of the hips were unremarkable."  It is clear from the notes that Dr. Joseph was not opining on Sibley's pain level or functional limitations when he made this statement.  One of Sibley's motivations for visiting Dr. Joseph was "to review her hip films to see if there is any evidence of mechanical failure of her hip implant."  His assessment that her hip X-rays "appear fine" (he did not say that they were "unremarkable"), therefore, was merely a statement that there had been no mechanical failure of Sibley's hip implant; it does not contradict his 2011 opinion regarding her severe physical restrictions.  Finally, the ALJ noted that

after Dr. Joseph gave Sibley an injection of pain relievers, "the claimant reported that her hip was fine." Id. at 28. In fact, Dr. Joseph's notes state that the injection "did give her relief today but how long lasting it is, it is hard to tell. Hopefully it will help her somewhat." Id. at 290. The ALJ's characterization of Sibley's statement that her hip was "fine" is inaccurate.

For the foregoing reasons, the ALJ's reasons for discounting Dr. Joseph's opinion are not supported by substantial evidence. On remand, the ALJ is free to find Dr. Joseph's medical opinion not credible, but he must do so on a proper basis. See 20 C.F.R. § 404.1527(c), (d)(2); Polanco-Quinones, 477 Fed. Appx. at 746.[6]

---

[6] The ALJ also failed to address any of the medical evidence in the record beyond the evaluations submitted by Drs. Joseph and Masewic. In particular, he neglected medical records and treatment notes from Sibley's visits to Tufts Medical Center, Pulmonary Associates, Newton-Wellesley Orthopedics, St. Joseph Hospital, St. Joseph Family Medical Center, and the Center for Physical Therapy and Exercise. Although some of these records relate to treatment Ms. Sibley received either before or after the relevant time period, they are still relevant to a determination of disability. See Moret Rivera v. Sec'y of Health & Human Services, 19 F.3d 1427, *6 (1st Cir. 1994) [No.93-1700, slip op. at 6]. The ALJ also failed to assess the credibility of Sibley's husband's testimony. The ALJ's findings of fact are not conclusive when they are "derived by ignoring evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

**B.    The ALJ Was Required to Call a Medical Expert**

Sibley next argues that the ALJ was required to call a medical expert to testify about the plaintiff's onset date of disability in accordance with SSR 83-20.  Titles II & XVI: Onset of Disability, 1983-1991 Soc. Sec. Rep. Serv. 49 (S.S.A 1983) ("SSR 83-20").  I agree.

"The starting point in determining the date of onset of disability is the individual's statement as to when disability began."  Id.  The date alleged by the claimant should be used so long as it is consistent with the evidence available.  Id.  If the date of onset must be inferred from ambiguous evidence, the ALJ must call on a medical adviser to make that inference, even if the ALJ has not made a determination about the claimant's present disability.  Id.; Ryan v. Astrue, No. 08-CV-17-PB, 2008 WL 3925081, at *8 (D.N.H. Aug. 21, 2008).

In her initial application, Sibley indicated that her date of onset was April 1, 2003.  During the hearing and in a post-hearing memorandum, Sibley amended her alleged date of onset to

On remand, the ALJ shall address the entire medical record in determining whether Sibley was disabled during the relevant period.

23

June 9, 1992, the date of onset as determined by the SSA in its

original award of SSDI benefits.  At the hearing, the ALJ used

the April 1, 2003, date "for the sake of argument," essentially

conceding that the onset date was ambiguous.  In his decision,

he stated that the date of onset was April 1, 2003, but did not

address Sibley's efforts to amend the date.  He provided no

explanation for his conclusion that the appropriate onset date

was April 1, 2003.  Here, the date of onset was remote,

ambiguous, and disputed.  Accordingly, the ALJ was required to

call a medical adviser to testify as to the onset date.[7]

C.   **Substantial Evidence Does Not Support the ALJ's
     Determination of Sibley's Credibility**

The ALJ concluded that Sibley's "credibility as to the

severity of her symptoms is, at best, suspect."  Tr. 27.  The

ALJ is responsible for determining issues of credibility.

Irlanda Ortiz, 955 F.2d at 769.  I defer to an ALJ's credibility

determinations if they are based on substantial evidence.  Ward,

211 F.3d at 655; Irlanda Ortiz, 955 F.2d at 769.  Here, the ALJ

failed to identify substantial evidence to support his

---

[7] The claimant does not explain what effect an earlier onset
date would have on the outcome of her claim, given that she
received benefits until February or March 2003.

credibility finding.  Accordingly, it is not entitled to deference.

1.  No Documentation of Exacerbations Between
    April 1, 2003, and September 30, 2004

The first factor the ALJ considered in determining Sibley's lack of credibility was that the record showed "occasional office visits but no documentation of exacerbations requiring emergency room visits or hospitalization" between April 1, 2003, and September 30, 2004.  Although true, the ALJ failed to consider relevant evidence of Sibley's hospitalizations and emergency room visits before April 1, 2003, and after September 30, 2004.[8]

For example, a treatment note from an office visit with Dr. Gregory Williams on October 6, 2004 – less than one week after the date last insured – states that Sibley visited the emergency room on October 5, 2004.  Tr. 298.  Additionally, the ALJ

---

[8] Medical evidence from a period "after a claimant's insured status expires may be considered for what light (if any) it sheds on the question whether claimant's impairment(s) reached disabling severity *before* claimant's insured status expired." Rivera, 19 F.3d at *5 (emphasis in the original).  Medical evidence from before the alleged date of onset is also relevant because it aids the claimant in proving that "her impairment(s) reached a disabling level of severity by that date." Id.  An ALJ's findings of fact are not conclusive when they are "derived by ignoring evidence." Nguyen, 172 F.3d at 35.

ignored record evidence showing that Sibley underwent multiple joint surgeries before and after the relevant time period and visited the emergency room multiple times, including on January 6, 2003, id. at 276; October 5, 2004, id. at 264-66; April 8, 2005, id. at 256; and October 24, 2005, id. at 248.  Thus, the fact that the record may not demonstrate that her impairments worsened between April 1, 2003, and September 30, 2004, does not constitute substantial evidence that her complaints are not credible.

    2.  Sibley's Symptoms are "nominal in severity"

Second, the ALJ discredited Sibley's testimony about the severity of her hip pain, finding that "the record shows her symptoms have remained nominal in severity over time."  The ALJ identified no evidence in the record that supports this conclusion, and, in fact, medical evidence in the record shows that her pain has been quite severe over time, requiring regular prescriptions for and injections of heavy painkillers and repeated visits to doctors, not to mention multiple joint replacements and other surgeries.[9]  The ALJ's bald statement,

---

[9] For example, on July 12, 2004, Sibley visited Dr. Gregory Williams for a cortisone shot and renewal of her Vicodin prescription for her foot pain and back pain.  Tr. 300.  At an

unsupported by the record and unexplained in his decision, that Sibley's pain has been "nominal in severity" cannot constitute substantial evidence that she is not credible.

    3.   <u>Sibley Failed to Pursue "regular treatment modalities"</u>

Third, the ALJ claimed to disbelieve Sibley because she "does not rely on regular treatment modalities."  The ALJ did not specify which types of treatment were available to Sibley of which she did not take advantage.  Moreover, the record clearly shows that Sibley did rely on office visits, medication, emergency room visits as needed, and surgery as needed.  The ALJ's statement, unsupported by the record, that Sibley did not rely on regular treatment modalities also cannot constitute substantial evidence of her lack of credibility.

---

appointment with Dr. Gregory on August 13, 2004, she complained of "total body joint aches, fatigue, and [being] overweight." <u>Id.</u> at 299.  Dr. Williams found her complaints sufficiently credible to continue prescribing Vicodin.  <u>Id.</u>  On October 6, 2004, she reported to Dr. Williams that she experienced shooting pain "all the way down her leg."  <u>Id.</u> at 298.  She said that her right leg was "giving out on her, and prednisone shots have not helped."  <u>Id.</u>  Dr. Williams observed that "[h]er gait shows inability to abduct the right hip due to pain."  <u>Id.</u>  He referred her to an orthopedist for further evaluation.  <u>Id.</u>  On January 19, 2006, Dr. Joseph recommended total knee replacement. <u>Id.</u> at 285.

4.   Daily Activities

Finally, the ALJ stated that Sibley "reports no significant problems with daily activities" and is "able to do simple chores, run errands, care for her two children, and partake in recreational activities."  Again, the ALJ failed to identify any specific evidence in the record to support these findings.  It is unclear what chores, errands, or childcare the ALJ believes Sibley could accomplish.  Her testimony refutes this conclusion. See Tr. at 47-48 (stating that she sleeps all day so she can be awake when her children are home, is unable to shower on her own, cannot stand to cook and therefore can only supervise her family in the kitchen, and cannot drive).  Her husband's testimony corroborated hers.  He testified that he performed most of the physical child care tasks because Sibley was unable to do so.  Id. at 72.

Accordingly, I remand for the ALJ to make credibility findings on a proper basis.  The ALJ "is still free to find the appellant's testimony . . . is not credible." Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986). However, he must support his result with substantial evidence and "make specific findings as to the relevant evidence he

28

considered in determining to disbelieve the appellant."   Id. at

26.[10]

---

[10] Sibley also argues that the ALJ's failure to discuss or
decide her motion to reopen the 2003 termination of SSDI
constituted error requiring remand.  I find no basis in the
record for the Commissioner's argument that the ALJ implicitly
denied the motion at the hearing when he noted the gap between
the termination date in 2003 and the claimant's 2009 filing of a
new application.  See Doc. No. 12-1.  The claimant identifies no
case law or regulation that requires an ALJ to address a motion
to reopen, and I find none.  Accordingly, I decline to decide
this issue.

Although the SSA's internal practice manual requires the
ALJ to make a decision on a motion to reopen, see HALLEX I 2-9-
01, http://www.ssa.gov/OP_Home/hallex/I-02/I-2-9-1.html ("If . .
. the record shows that in connection with the current
application the claimant specifically requested reopening and
revision of an unfavorable determination or decision on a prior
application, the ALJ must include in the decision a finding on
the reopening and revision issue, and supporting rationale."),
generally, the manual does not carry the force of law.
Chaluisan v. Comm'r Soc. Sec., 481 F. App'x 788, 791 (3d Cir.
2012); Newton v. Apfel, 209 F.3d 448, 459-60 (5th Cir. 2000);
Moore v. Apfel, 216 F.3d 864, 868 (9th Cir. 2000); Schweiker v.
Hansen, 450 U.S. 785, 789 (1981).

The Fifth Circuit, however, has held that "where the rights
of individuals are affected, an agency must follow its own
procedures," and, if the claimant can show that a violation of
HALLEX was prejudicial, review in federal court is available.
Newton, 209 F.3d at 459-60.  The Ninth Circuit, in contrast, has
concluded that HALLEX is "strictly an internal guidance tool,
providing policy and procedural guidelines to ALJs and other
staff members.  As such, it does not prescribe substantive rules
and therefore does not carry the force and effect of law."  See
Moore, 216 F.3d at 868.

I need not address or resolve this issue because the
claimant has not demonstrated prejudice.  See Butterick v.
Astrue, 430 F. App'x 665, 668 n.3 (10th Cir. 2011) (declining to
decide whether to follow the Fifth Circuit's or Ninth Circuit's

## IV.   CONCLUSION

For the foregoing reasons, I deny the Commissioner's motion to affirm (Doc. No. 12) and grant Sibley's motion to reverse or remand (Doc. No. 11).   Pursuant to 42 U.S.C. § 405(g), I remand the case to the Social Security Administration for further proceedings consistent with this decision.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


February 15, 2013

cc:   Simon R. Brown, Esq.
      Mark Bronstein, Esq.
      T. David Plourde, Esq.

---

approach because the claimant "has not affirmatively shown that she was prejudiced by the alleged HALLEX violations").   Thus, while I urge the ALJ to address the claimant's motion to reopen, I find no jurisdictional basis for requiring him to do so.

30